## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MICHA RICH, *et al.*,

     Plaintiffs,

v.

GEORGIA, *et al.*

     Defendants.

Civil Action

**JURY TRIAL DEMANDED**

## COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

INTRODUCTION ....................................................................................... 1

JURISDICTION AND VENUE ..................................................................... 7

PARTIES .................................................................................................... 8

EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS ......................... 13

OPERATIVE FACTS ................................................................................. 16

    A. Mr. Rich ......................................................................................... 17

    B. The Does ......................................................................................... 21

    C. Mr. Johnson ................................................................................... 23

    D. Campaign for Southern Equality ................................................... 24

    E. Transgender Status, Gender Dysphoria, and Transition-Related Health Care ......... 28

    F. Defendants' Discriminatory Health Plans ...................................... 32

        1. Plan Selection and Administration ............................................ 32

        2. The Exclusion's Design ........................................................... 34

    G. Plaintiffs' Attempts to Obtain Healthcare Coverage and Their Requests for Defendants to Stop Discriminating ............................ 36

        1. Mr. Rich ................................................................................ 38

        2. The Does ................................................................................ 40

        3. Mr. Johnson ........................................................................... 43

    H. Defendants' Knowledge of the Exclusion's Unlawfulness and Lack of Medical or Any Other Basis ....................................... 46

    I. Plaintiffs' Injuries ........................................................................... 53

i

CAUSES OF ACTION ................................................................................ 54

    COUNT I: 42 U.S.C. § 1983 ............................................................... 54

    COUNT II: Title VII ........................................................................... 56

    COUNT III: Title IX of the Education Amendments .................................. 57

JURY DEMAND ................................................................................... 57

REQUEST FOR RELIEF ......................................................................... 57

Plaintiffs Micha Rich, Benjamin Johnson, Jane Doe, John Doe,[1] and the Campaign for Southern Equality (collectively, the "Plaintiffs") file this Complaint against the State of Georgia; the Georgia Department of Community Health; the Georgia Board of Community Health; the Georgia State Health Benefit Plan; the Georgia Department of Audits and Accounts; the Georgia Department of Human Services; Bibb County School District; the following people in their official capacities: State Health Benefit Plan Executive Director Louis Amis; Georgia Board of Community Health Members Norman Boyd, Robert S. Cowles III, David Crews, Russell Crutchfield, Roger Folsom, Nelva Lee, Mark Shane Mobley, Cynthia Rucker, and Anthony Williamson; Commissioner of Human Services Candice L. Broce; State Auditor Greg Griffin; and Bibb County School District Superintendent Dr. Dan A. Sims; and one or more Doe Defendants constituting the "leadership" of SHBP, who are sued in their official and individual capacities; (collectively, the "Defendants"). In support of the Complaint, the Plaintiffs allege as follows.

## INTRODUCTION

1.      This is an employment discrimination case.

---

[1] At the first available opportunity, the Does will file a motion seeking leave to proceed pseudonymously.

2.     Title VII, among other laws, prohibits discriminating against employees because they are transgender. *Bostock v. Clayton Cnty., Ga.*, --- U.S. ---, 140 S. Ct. 1731, 1754 (2020). Where the employer is the government, such discrimination is not only a violation of statute, it is also unconstitutional. *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011).

3.     The State Health Benefit Plan ("SHBP") is a program of the State of Georgia that provides healthcare benefits to employees and retirees of state agencies and school districts within the state.

4.     Plaintiffs Micha Rich, Jane Doe, and Benjamin Johnson are employees of government entities in Georgia, each of which are Defendants here and each of which provides employee healthcare benefits through SHBP. Jane Doe's young adult child, Plaintiff John Doe, is a beneficiary of his mother's healthcare coverage. Mr. Rich and Mr. and Ms. Doe are all currently, and Mr. Johnson was formerly, enrolled in SHBP-offered plan operated by Anthem, a health insurance company. Prior to this year, Mr. Rich was enrolled in an SHBP-offered plan operated by UnitedHealthcare ("United"), a health insurance company.

5.     Mr. Rich, Mr. Doe, and Mr. Johnson are all transgender people who require doctor-recommended gender-transition treatment for a medical condition, namely gender dysphoria.

6.     Members enrolled in SHBP health plans generally receive coverage for their medically necessary care. However, the SHBP plans in which Plaintiffs are enrolled withdraw coverage when it is needed for transgender healthcare—even where the exact same care is covered for other members who need it for other purposes (the "Exclusion").

7.     United withdraws coverage for care that would otherwise be covered as medically necessary when it is needed for the purpose of "sex transformation operations and related services." It lists this exclusion under the heading "Personal Care, Comfort or Convenience," along with televisions, air conditioners, and barber service.

8.     Likewise, Anthem withdraws coverage for care that would otherwise be covered as medically necessary when it is needed for "a sex change and/or the reversal of a sex change."

9.     These plans have denied coverage for medically necessary care that physicians of Mr. Rich, Mr. Doe, and Mr. Johnson have prescribed for them, including male chest reconstruction (informally known as "top surgery") for all three, as well as hormone medications for Mr. Rich and Mr. Doe. The sole explanation that the plans provided to Plaintiffs for their denials is the existence of the Exclusion.

10.    The Exclusion applies only to transgender care. If Plaintiffs sought coverage of the exact same care, but for another medical need, then the Exclusion would not bar coverage.

11.    The Exclusion discriminates against Plaintiffs, and all transgender SHBP beneficiaries who are subject to it, on the basis of sex.

12.    "[D]iscrimination based on … transgender status necessarily entails discrimination based on sex." *Bostock*, 140 S. Ct. at 1747.

13.    In addition to baldly discriminating on the basis of transgender status, in violation of *Bostock*, the Exclusion also discriminates on the basis of sex because "sex discrimination includes discrimination against transgender persons because of their failure to comply with stereotypical gender norms." *Glenn*, 663 F.3d at 1317.

14.    The Exclusion also discriminates on the basis of sex because the treatments it applies to affect the "biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739.

15.    The Exclusion also discriminates against a suspect or quasi-suspect class— transgender people—protected by the Equal Protection Clause of the United States Constitution.

16.    As a result of the Exclusion, Mr. Rich, and Mr. Doe were forced to cover the cost of gender affirming care out-of-pocket; while Mr. Johnson was forced to forego

top surgery altogether until he left the SHBP. All transgender Plaintiffs were forced to forego timely care and faced significant delays in obtaining care.

17. Mr. Rich, Mr. and Ms. Doe, and Mr. Johnson have also suffered, and continue to suffer, distress, humiliation, and a loss of dignity because of this targeted discrimination and Defendants' categorical denigration of them, their families, and their medical needs.

18. Defendants have been aware for years that the Exclusion is unlawful, yet they have done nothing to end it.

19. Defendants are familiar with a federal lawsuit challenging a substantively identical transgender health exclusion in the employee health plan of a different state entity—the University System of Georgia ("USG")—filed in the Middle District of Georgia in 2018. That suit, *Musgrove v. Board of Regents*, No. 3:18-cv-00080-CDL, was resolved by USG's agreement to remove the exclusion from its employee health plan and pay the plaintiff $100,000. Since the settlement, USG's health plan has remained solvent and has continued to function as it previously did, except that it no longer discriminates against transgender beneficiaries.

20. After the United States Supreme Court decided *Bostock*, SHBP's general counsel told its executive director, "it may be inferred that the Court would find that health coverage that excludes benefits for transgender or homosexual members

violates Title VII. Additionally, transgender-related care is recognized as medically necessary by insurance companies. USG recently settled a similar case against it agreeing to remove the transgender exclusion and pay the plaintiff employee."

21.     Since then, the Middle District of Georgia ruled that an exclusion identical to that in the SHBP-offered Anthem plan, appearing in a county's employee health plan, violates Title VII. *Lange v. Houston Cnty.*, --- F. Supp. 3d ----, 2022 WL 1812306, at *11–12 (M.D. Ga. June 2, 2022). A jury subsequently awarded the plaintiff in that case $60,000 in damages.

22.     Defendant Department of Community Health also agreed to remove the transgender health exclusion from the State of Georgia's Medicaid plan after they were sued about that before this Court. *Thomas v. Georgia Dep't of Cmty. Health*, No. 1:21-cv-02558-LMM, (N.D. Ga. June 27, 2022), ECF No. 65-1. Since that time, Georgia's Medicaid plan has remained solvent and has continued to function as it previously did, except that it no longer discriminates against transgender beneficiaries.

23.     Plaintiffs have repeatedly asked Defendants to remove the Exclusion from the SHBP, including in correspondence, through various administrative filings, and in attempted negotiations with the State Attorney General's office. Defendants have steadfastly refused.

24.     Plaintiffs thus bring this action seeking declaratory and injunctive relief and an award of damages caused by Defendants' discriminatory denial of health care coverage.

### JURISDICTION AND VENUE

25.     This action is brought pursuant to 42 U.S.C. § 1983, with claims arising under the equal protection guarantee of the Fourteenth Amendment of the United States Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX").

26.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).

27.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 2000e-5(g)(1).

28.     Under 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because all defendants are residents of Georgia and at least several Defendants reside in the District. *Id.* § 1391(b)(1). Further, a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Fulton County. *Id.* § 1391(b)(2). For the same reason, the action is brought in the Atlanta Division.

## PARTIES

### A.   *Plaintiffs*

29.    Plaintiff Micha Rich resides in Fulton County, Georgia. He is employed as a staff accountant at the Georgia Department of Audits and Accounts. He is enrolled in an SHBP-offered plan administered by Anthem, and prior to this year was enrolled in an SHBP-offered plan administered by United.

30.    Plaintiffs Jane Doe and John Doe reside in Paulding County, Georgia. Ms. Doe is employed as an Admin Support 3 in the Division of Family and Children Services, which is a division of the Georgia Department of Human Services. Mr. Doe is Ms. Doe's young adult child. Both are enrolled in an SHBP-offered plan administered by Anthem.

31.    Plaintiff Benjamin Johnson resides in Bibb County, Georgia. He is employed as a Media Clerk in the Bibb County School District. Until this year, he was enrolled in an SHBP-offered plan administered by Anthem.

32.    The Campaign for Southern Equality (CSE) is a nonprofit organization dedicated to advancing LGBTQ+ civil rights throughout the South. It is based in Asheville, North Carolina, and has staff located in Georgia. It has about 18,000 members throughout the nation, with about 750 residing in Georgia.

### B.   Institutional Defendants

33.     The State of Georgia is a state. It has 15 or more employees and is engaged in the business of government, which affects commerce. It offers a health benefit plan—the SHBP—to its employees.

34.     The SHBP is the health benefit plan for "State Employees" and "Public School Employees." Ga. Comp. R. & Regs. 111-4-1-.01(2), (44), (52). It is a division of the Department of Community Health. It is led by an Executive Director. It is located at 2 Peachtree Street, NW, Atlanta, GA 30303. It has 15 or more employees and is engaged in the business of government, which affects commerce.

35.     The SHBP is a division of the Department of Community Health. The Department of Community Health is a statutory agency created by O.C.G.A § 31-2-1 *et seq.* to bear responsibility for "health care policy, purchasing, planning, and regulation" for the State of Georgia. O.C.G.A § 31-2-1(1). It is located at 2 Peachtree Street, NW, Atlanta, GA 30303. It has 15 or more employees and is engaged in the business of government, which affects commerce.

36.     The Board of Community Health ("the Board") "establish[es] the general policy to be followed by the Department of Community Health." O.C.G.A § 31-2-3(a). It is "the governing body authorized to exercise jurisdiction over the SHBP." Ga. Comp. R. & Regs. 111-4-1-.01(9). Its duties include determining the benefits to

be offered under the SHBP and negotiating contracts with third-party administrators. Ga. Comp. R. & Regs. 111-4-1-.10. For purposes of this Complaint, it is located at 2 Peachtree Street, NW, Atlanta, GA 30303. It has 15 or more employees and is engaged in the business of government, which affects commerce.

37.     The Georgia Department of Audits and Accounts is a statutory agency created by O.C.G.A § 50-6-1 to audit all state institutions, thereby improving the accountability of state agencies, universities, nonprofit organizations, and county governments. The Department of Audits and Accounts is located at 270 Washington Street, SW, Room 1-156, Atlanta, Georgia 30334. It has 15 or more employees and is engaged in the business of government, which affects commerce.

38.     The Georgia Department of Human Services is one of the largest agencies in the Georgia State Government, delivering a wide range of human services to the people of Georgia. One of its divisions is the Division of Children and Family Services, which provides child and family support services and investigates and addresses child abuse and neglect. The Department of Human Services is located at 2 Peachtree St NW, 19th Floor, Atlanta. It has 15 or more employees and is engaged in the business of government, which affects commerce.

39.     Bibb County School District is a local government agency that operates the public schools in Bibb County, Georgia. It has elected to participate in the State

Health Benefit Plan for its public-school employees. It receives federal funding through a wide variety of programs including Title I of the Elementary and Secondary Education Act and the National School Lunch Program. It has 15 or more employees and is engaged in the business of government and the business of education, which affect commerce. It is located at 484 Mulberry Street, Macon.

## C.   *Individual Defendants*

40.    The Board consists of nine members appointed by the Governor ("Board Members"), each of whom is a Defendant. The Board's Members are:

     a.     Defendant Norman Boyd;

     b.     Defendant Robert S. Cowles III;

     c.     Defendant David Crews;

     d.     Defendant Russell Crutchfield;

     e.     Defendant Roger Folsom;

     f.     Defendant Nelva Lee;

     g.     Defendant Mark Shane Mobley;

     h.     Defendant Cynthia Rucker; and

     i.     Defendant Anthony Williamson;

41.    Louis Amis is the SHBP's current Executive Director. He has ultimate supervisory authority over the SHBP's day-to-day operations, including ultimate supervisory authority over personnel.

42.    Doe Defendants are one or more individuals whom the SHBP's then-Executive Director John Rickman referred to as SHBP's "leadership," with whom he had to coordinate in deciding whether the Exclusion would be retained or removed.

43.    Candice Broce is the Commissioner of the Department of Human Services. She is the executive of the Department, responsible for oversight of the Department's day-to-day operations, including ultimate supervisory authority over personnel.

44.    Greg. S Griffin is the State Auditor of Georgia. He is the executive of the Georgia Department of Audits and Accounts, responsible for oversight of the department's day-to-day operations, including ultimate supervisory authority over personnel.

45.    Dr. Dan A. Sims is the Superintendent of Bibb County School District. He is the executive of the school district, responsible for oversight of the department's day-to-day operations, including ultimate supervisory authority over personnel.

46.     Each individual defendant is named in their official capacity, except the Doe Defendants, who are sued in their official and individual capacities.

## **EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS**

*A.     Mr. Rich*

47.     On April 28, 2020, Mr. Rich timely filed charges of sex discrimination in violation of Title VII with the Georgia Commission on Equal Opportunity ("GCEO") against Defendants the State of Georgia, the Department of Audits and Accounts, and the Department of Community Health, among others.[2]

48.     GCEO subsequently transferred each of these charges to the Equal Employment Opportunity Commission ("EEOC").

49.     On January 13, 2022, the EEOC issued determination letters as to the State of Georgia, the Department of Community Health, the Board of Community Health, and the Department of Audits and Accounts.

50.     Those determination letters each stated the EEOC's conclusion that "there is reasonable cause to conclude that [Mr. Rich] was subjected to different terms and

---

[2] All Plaintiffs, including Mr. Rich, also brought disability-related claims in charges against Defendants and other respondents; those disability-related claims are not a part of this suit.

conditions of employment and denied benefits because of his sex (i.e., male transgender) in violation of Title VII."

51.     Following the determination letters, the EEOC notified Mr. Rich on February 8, 2022, that efforts to conciliate the charges were unsuccessful and further efforts "would be futile or non-productive."

52.     EEOC then referred Mr. Rich's complaint to the Department of Justice, which launched its own investigation into Mr. Rich's charges.

53.     In November 2022, due to their urgent need for relief, including ongoing denials of coverage for their medications, Mr. Rich and the other Plaintiffs requested Notices of Right to Sue.

54.     On December 13, 2022, the EEOC issued notice of right to sue letters naming State of Georgia, the Department of Community Health, the Board of Community Health, and the Department of Audits and Accounts.

**B.     *Mr. and Ms. Doe***

55.     On August 21, 2020, Ms. Doe timely filed charges of sex discrimination in violation of Title VII with the GCEO against, among others, Defendants the State of Georgia, the Department of Human Services, the Department of Community Health, and the Board of Community Health.

56.     GCEO subsequently transferred each of these charges to the EEOC.

14

57.     On January 13, 2022, the same day it issued determination letters as to Mr. Rich's charges, the EEOC issued determination letters as to the State of Georgia, the Department of Community Health, the Board of Community Health, and the Department of Human Services.

58.     Those determination letters each stated the EEOC's conclusion that "there is reasonable cause to conclude that [Ms. Doe] was subjected to associational discrimination, denied benefits, and received less compensation because of her child's sex, in violation of Title VII."

59.     Following the determination letters, the EEOC notified Ms. Doe on February 8, 2022, the same day it notified Mr. Rich, that efforts to conciliate the charges were unsuccessful and further efforts "would be futile or non-productive."

60.     The EEOC then referred Ms. Doe's complaint, along with Mr. Rich's, to the Department of Justice, which launched its own investigation into Ms. Doe's charges

61.     On December 13, 2022 the EEOC issued notice of right to sue letters naming State of Georgia, the Department of Community Health, the Board of Community Health, and the Department of Human Services.

## C.     Mr. Johnson

62.     On February 18, 2022, Mr. Johnson timely filed charges of sex and disability discrimination in violation of Title VII and the ADA with the GCEO against, among

others, the State of Georgia, the Health Benefit Plan, the Board of Community

Health, the Department of Community Health, and the Bibb County School District.

63.     GCEO subsequently transferred each of these charges to the EEOC.

64.     On December 13, 2022 the EEOC issued notice of right to sue letters naming

the Governor of the State of Georgia, the Health Benefit Plan, the Board of

Community Health, the Department of Community Health, and the Bibb County

School District, among others.

## **OPERATIVE FACTS**

65.     Mr. Johnson, Mr. Rich, and Mr. Doe are transgender men. Although they were

assigned the sex of female at birth based on external physical sex characteristics,

they are male.

66.     A transgender person is someone whose sex assigned at birth, as determined

by the appearance of external sex characteristics, does not match that person's

innate, internal sense of being male, female, or some other category (often referred

to as "gender identity"). Most of the time, people born with male-typical external

characteristics experience themselves as male, and those with female-typical

external characteristics experience themselves as female. However, for a transgender

person, their external characteristics and their internal perception of sex do not

match. This feeling of incongruence can and often does lead to a condition called gender dysphoria.

67.    Gender dysphoria is the clinically significant distress that results from incongruence between one's gender assigned at birth and one's internal sense or experience of gender.

**A.    *Mr. Rich***

68.    As a child in Peachtree City, Mr. Rich experienced significant distress, but he did not understand its source. Mr. Rich had an inkling about his gender identity and experienced what he now identifies as gender dysphoria, but he had not heard of transgender people. He, therefore, could not identify or articulate the source of his discomfort.

69.    For example, Mr. Rich recalls fearing that he would be discovered and punished for being in female-only gender environments—like his summer camp cabin—because his internal sense of self, even as a child, was that he was not a girl.

70.    Since high school, Mr. Rich has eschewed dresses and other more feminine clothes in favor of a more masculine presentation. For example, beginning in high school, he has worn suits for formal occasions and worn his hair short and in a more masculine style.

71.    Eventually, he became familiar with the term "transgender" and recalls that, initially, his associations with the term were negative and fear-based, feelings he now recognized as rooted in his own fear of the stigma transgender people confront every day.

72.    Starting around early 2018, Mr. Rich came to understand how the term "transgender" applied to him and to explore whether the discomfort he had always felt with his body was related to his gender identity.

73.    He began seeing a trans-affirming therapist in summer 2018 to explore his feelings of discomfort with his body. That fall, he joined a support group for trans and gender non-binary people. For the first time, Mr. Rich asked friends and peers to use his correct pronouns.

74.    Mr. Rich was also diagnosed with gender dysphoria for the first time in fall 2018. Subsequently, his therapist, Anna Baxter, MA, LPC, also made the same diagnosis, one with which his current therapist, Celeste Myers, LPC, LMHC, concurs.

75.    Mr. Rich's gender dysphoria, left untreated, continued to cause him to experience stress, anxiety, depression, and distress, making it difficult to think, concentrate, and interact with others, including with his family, friends, partner, and coworkers.

76.    Because certain parts of his body—particularly, his female secondary sex characteristics—caused him distress, Mr. Rich decided to pursue congruence between his body and his mind.

77.    Beginning in October 2018, Mr. Rich began taking testosterone as prescribed by Erin Everette, NP, under the supervision of Dr. Joseph Smiddy, MD.

78.    Generally, hormone therapy—like the testosterone prescribed to Mr. Rich— helps to alleviate gender dysphoria in transgender men by changing the predominant sex hormone in the body from estrogen to testosterone. This results in mental health benefits as well as physical changes, including the development and maintenance of male sex characteristics. Common effects include body fat redistribution, increased muscle mass and strength, toughening and increased oiliness of skin, increased libido, and thickening and more rapid growth of body and facial hair.

79.    The hormone replacement therapy made Mr. Rich's features more masculine over time and reduced the gender dysphoria caused by his female secondary sex characteristics. Hormone therapy also dramatically changed his mood and the way he sees himself. For the first time, Mr. Rich could look at himself in a mirror and recognize himself. The impact has been "incredible," and it changed his entire life. He is now more confident and less afraid to speak out. He perceives that others finally see him the way he sees himself.

19

80.    In early 2019, Mr. Rich began using the name "Micha" and changed his social media profiles to reflect his name and pronouns accurately.

81.    Mr. Rich's family has supported him in his transition. They now call him "Micha" and use accurate pronouns when referring to him. They have even given him gifts reflecting his identity. For example, his mom gave him a personalized camping knife, bearing his name and reflecting his now-masculine identity and appearance.

82.    Although the medical treatment Mr. Rich received and other measures he took were therapeutic, Mr. Rich required additional treatment to treat his gender dysphoria and limit the stress, anxiety, depression, and distress caused by his secondary sex characteristics.

83.    The testosterone taken by Mr. Rich exacerbated his chest dysphoria because of the increasing discrepancy between his male sex characteristics and his typically female breasts. Mr. Rich also feared for his safety, given the incongruence between his increasingly masculine appearance and his remaining female secondary sex characteristics.

84.    Without surgery, Mr. Rich could not remove or obscure his most prominent female secondary sex characteristic, namely his breasts.

85.   To alleviate his gender dysphoria and upon the recommendation of his primary care doctor, two therapists, and a surgeon, Mr. Rich sought top surgery.

86.   As detailed further below, coverage for Mr. Rich's surgery was denied due to Defendants' discriminatory Exclusion. So was coverage for his testosterone. These denials had serious consequences for his health and his finances.

### B.   The Does

87.   As a young child in Dallas, Georgia, Mr. Doe experienced ongoing discomfort with his sense of self, his body, and his expression, but could not articulate the reasons. Though he has now received a diagnosis of gender dysphoria, which has since provided him with a deeper understanding of his identity, Mr. Doe experienced pain and hardships throughout his childhood, directly caused by his understanding of his gender.

88.   From a young age, Mr. Doe presented a stark contrast with his older sister. Unlike the latter, who always wanted to wear dresses and play with dolls, Mr. Doe rejected typical feminine clothing and toys. From time to time, Mr. Doe also used a different name when completing school assignments.

89.   In middle school, Mr. Doe attempted suicide and was consequently admitted to a mental health hospital. He received therapy for several years thereafter, but his self-injurious behaviors persisted for some time.

90.    Eventually, Mr. Doe realized that this gender identity was the source of his mental health struggles. Since 2019, Mr. Doe has identified as a man to his close family and friends. Mr. Doe and his mother discussed his gender identity before he came out to the rest of the family. Though his father and his sister initially struggled to understand, they are now both accepting, too, and want to learn how to best support Mr. Doe.

91.    Several years ago, Mr. Doe began using a chest binder to conceal his breasts. He primarily wore sweatshirts and large shirts, and he has buzzed his hair short. He also began hormone therapy, which produced a noticeable change in his voice and facial construction.

92.    Mr. Doe has changed his name and now has a state identification that reflects both his name and gender identity.

93.    Though Mr. Doe took steps to alleviate his dysphoria, he continued to struggle with certain parts of his body—particularly, his female secondary sex characteristics. He avoided looking down as much as possible, especially in the shower and while undressed, and felt that his breasts were a constant reminder of the sex he was assigned at birth. Mr. Doe felt that a male chest surgery would allow him to embrace his fullest self, live authentically, and socialize as a man.

94.     As detailed further below, coverage for Mr. Doe's surgery was denied due to Defendants' discriminatory Exclusion. So was coverage for his testosterone. These denials had serious consequences for Mr. Doe's health and the Doe family's finances.

**C.     Mr. Johnson**

95.     Growing up in the small town of Milledgeville, Georgia, Mr. Johnson experienced a challenging upbringing.

96.     As a child, Mr. Johnson was teased for "looking like a boy," because he expressed traditionally masculine characteristics such as having short hair. He often encountered people who were confused by his gender.

97.     Mr. Johnson recalls the presence of at least one other transgender person in his hometown but understood transgender identity to carry mostly negative connotations. His knowledge was limited mostly to hearing antagonistic and disparaging remarks about transgender women.

98.     As he grew up, and especially as he underwent puberty, Mr. Johnson experienced greater discomfort with his gender. During his adolescence, Mr. Johnson gained weight and his breasts began developing, which caused him ongoing embarrassment.

99.    In November of 2017, Mr. Johnson started seeing a therapist, who diagnosed Mr. Johnson with gender dysphoria and recommended hormone replacement therapy. The following month, Mr. Johnson began taking doctor-prescribed testosterone therapy and presenting full time as a man. In December of that year, he published a social media post announcing his transition.

100.   On July 21, 2020, Mr. Johnson legally changed his name; and later updated the name and gender marker on his ID. He also amended his birth certificate to reflect his name, though it still reflects the incorrect gender marker. Mr. Johnson has also changed his name on his social security card.

101.   Mr. Johnson felt that the physical changes brought about by hormone therapy, such as the growth of facial hair, have made him appear more masculine and that testosterone brought him closer to who he should be. His transition, however, still felt incomplete, and Mr. Johnson ultimately sought top surgery to further alleviate his gender dysphoria.

102.   As detailed further below, coverage for Mr. Jonhson's surgery was denied due to Defendants' discriminatory Exclusion. This denial had serious consequences for his health.

**D.    *Campaign for Southern Equality***

103.   Founded in 2011, the Campaign for Southern Equality works across the South to promote LGBTQ+ equality – both legal and lived. Through working with tens of thousands of LGBTQ+ people across the South, the organization has identified that health equity and access to health care is a top-tier priority and that LGBTQ+ Southerners experience acute health disparities which are more pronounced for transgender people. As a result, the organization has steadily increased its programming and services related to health care access and health equity. Currently About 40% of the Campaign for Southern Equality's work focuses on LGBTQ+ peoples' access to healthcare. This previously made up only about 30% of its work, but in recent years CSE has had to increase its efforts in this area in response to its membership's clear need for safe and affirming healthcare and for combatting pervasive barriers to such care. The most common barriers members report include navigating insurance denials, obtaining coverage of transgender care, and identifying quality healthcare providers whose services are affordable or covered by insurance.

104.   When members contact the Campaign for Southern Equality about health insurance denials for transgender care, its staff frequently provides advocacy and healthcare navigation and/or referrals to attorneys who specialize in health insurance appeals.

105.   In 2015, the Campaign for Southern Equality launched the Southern Equality Fund (SEF). Through the SEF, the Campaign for Southern Equality provides grants to organizations and grassroots groups, including many that focus on providing direct health and wellness services; and Emergency Assistance Grants (EAG) to individuals in need in the amount of $250. Applicants can use EAG funding for basic needs like prescriptions or medical bills, groceries, rent/mortgage payments, prevention supplies, and more. Each year, the Campaign for Southern Equality distributes at least 10% of its organizational budget through SEF grants.

106.   In total, the Campaign for Southern Equality has distributed more than $1 million across 13 Southern states to organizations serving the LGBTQ+ community and to LGBTQ+ individuals in need. At least 373 grants have been made to organizations and individuals in Georgia, totaling $80,215

107.   A portion of CSE grant recipients are SHBP beneficiaries, and have requested grant funding to cover out-of-pocket costs for transgender care arising from the Exclusion, or to cover other expenses that the recipient cannot afford due to being impoverished by having to paying out-of-pocket for transgender care subject to the Exclusion.

108.   In the absence of the Exclusion, the limited funds of CSE's SEF grants would be directed to other LGBTQ+ Southerners in need.

109.   The Campaign for Southern Equality also facilitates access to healthcare for LGBTQ+ people in Georgia and throughout the South through a range of community health programming that includes: cultural competency trainings for healthcare service providers;  Pop-Up Resource Clinics that educate LGBTQ+ people about their rights, including in the healthcare context, instructing them, for example, how to address discrimination in healthcare settings; and community-based research focused on health, including a 2019 Southern LGBTQ Health Survey, the largest survey on LGBTQ+ health in the South that has been conducted.

110.   Additionally, the Campaign for Southern Equality produces *Trans in the South: A Guide to Resources and Services*, a regularly updated, bilingual (Spanish and English) directory of more than 400 Southern health service providers—including mental health providers, primary care physicians, HIV care specialists, and endocrinologists—whom Campaign for Southern Equality staff has confirmed are willing and competent to provide transgender care. This digital resource guide has been accessed by around 38,000 people in 2022 to date. *Trans in the South* collects information regarding, among other things, what type of transgender services the provider offers, what pre-requisites a patient must meet in order to receive transgender services, whether the provider serves Spanish-speaking populations,

where the provider is located, how the provider can be contacted, and whether the provider is likely to take on new patients within the next six months.

111. CSE devotes organizational resources to producing the *Trans in the South* guide. This work in part assists transgender individuals enrolled in SHBP in identifying providers of transgender care. But for the Exclusion, such information would normally be supplied by SHBP's own provider directory and member resources.

**E.    Transgender Status, Gender Dysphoria, and Transition-Related Health Care**

112. Being transgender bears no relation to a person's ability to perform or contribute to society. People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.

113. Nonetheless, transgender people face stigma and discrimination across all areas of life, from employment, to housing, to health care and public accommodations, in a way that establishes that they have been historically disadvantaged.

114.   The 2015 U.S. Transgender Survey Georgia State Report illuminates the issues facing transgender Georgians.[3] One out of five report losing a job due to their gender identity or expression. Of those who are employed, a third reported being fired, not hired, or denied a promotion for being transgender; and large percentages reported other forms of mistreatment, including being denied appropriate restrooms, told they had to hide their transgender status at work, or being verbally harassed or physically or sexually assaulted.

115.   This widespread discrimination results in disproportionate unemployment and poverty among transgender Georgians, who are three times more likely to be unemployed and five times more likely to be poor, relative to Georgia's general population.[4]

116.   Nearly one in three transgender Georgians have experienced homelessness at some point in their lives and more than one in four have been denied housing because

---

[3] National Center for Transgender Equality, *2015 U.S. Transgender Survey: Georgia State Report* (2017), http://www.transequality.org/sites/default/files/docs/usts/GA-State-Report-FINAL.pdf.

[4] Christy Mallory et al*., The Economic Impact of Stigma and Discrimination Against LGBT People in Georgia 35,* UCLA Law School Williams Inst. (Jan. 2017) https://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-GA-Jan-2017.pdf

of being transgender. Over half have avoided using public restrooms out of fear. One in three report negative experiences with health care providers, including being refused treatment; and one in four did not see a doctor when they needed to due to fear of being mistreated. Onerous bureaucratic requirements prevent most transgender Georgians from obtaining ID documents that correctly reflect their name and gender. This creates a public health and safety hazard: one in three transgender Georgians who have shown such an ID to another have experienced verbal harassment, denial of service, or assault as a result.

117.   Nationwide and in Georgia, transgender people lack political power and have been unable to translate public support into laws to protect themselves from discrimination. On average, public support for explicit protections in statewide employment nondiscrimination laws must reach 81% before such laws can be passed, reflecting a "democratic deficit" confronting transgender people.[5]

118.   The World Professional Association for Transgender Health ("WPATH"), an interdisciplinary professional and educational organization devoted to transgender health, has established internationally accepted Standards of Care ("SOC") for the

---

[5] Andrew R. Flores et al., *Transgender Inclusion in State Non-discrimination Policies: The Democratic Deficit and Political Powerlessness*, RESEARCH AND POLITICS 1, 1 (2015), https://journals.sagepub.com/doi/pdf/10.1177/2053168015612246.

treatment of people with gender dysphoria. Major medical and mental health organizations, including the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association, have endorsed the SOC as the authoritative standards of care.

119.   The treatment for gender dysphoria, as recommended by WPATH, is to assist the person in undergoing a gender transition that will alleviate the distress caused by gender dysphoria and allow the person to live in alignment with their internal sense of sex. The transition process has three main components—social, pharmacological, and surgical.

120.   Social transition involves bringing a person's gender expression and social sex role into alignment with their internal sense of sex. It may include wearing clothes, using a new name and pronouns, and interacting with peers and one's social environment in a manner that matches the person's internal sense of sex.

121.   A physician may also prescribe medications that change the hormone balance in the body to be consistent with the person's internal sense of sex. For example, a transgender woman would be prescribed medications that reduce testosterone and replace those hormones with estrogen, which will feminize that person's sex characteristics.

122.   Lastly, surgical treatment may be medically necessary to alleviate dysphoria experienced by transgendered persons and caused by having incongruent primary and secondary sex characteristics.

123.   The SOC also establish guidelines for when these treatments may be medically necessary for a given individual, including factors such as having a diagnosis of gender dysphoria, capacity to consent to treatment, and an absence of contra-indications.

**F.   *Defendants' Discriminatory Health Plans***

     **1.   Plan Selection and Administration**

124.   The Board of Community Health, through its members, approves the plans to be included in the SHBP, and is ultimately responsible for their terms and scope of coverage. It provides policy direction for the operation of the SHBP, adopts and promulgates rules and regulations for the effective administration of the SHBP, and establishes the annual rates of contributions for employing entities and members. It is responsible for plan design and for approving contracts with the insurance companies who serve as the SHBP's third-party administrators—including the United and Anthem plans in which Plaintiffs are enrolled. *See* O.C.G.A. § 45-18-2; Ga. Comp. R. & Regs. 111-4-1-.02(1), 111-4-1-.10.

125.   The Department of Community Health—specifically its SHBP division, under the leadership of the SHBP's Executive Director—advises and provides recommendations to the Board regarding the SHBP, and implements its decisions, including by administering the SHBP on a day-to-day basis. *See* Ga. Comp. R. & Regs. 111-4-1-.02(2).[6]

126.   Defendants Department of Audits and Accounts, Department of Health Services, and Bibb County School District are "Employing Entities" who offer the SHBP to their employees. *See* Ga. Comp. R. & Regs. 111-4-1-.02(3). Employing Entities, under the leadership of their executive officers, are responsible for complying with SHBP regulations, and ensuring that their employees are able to

---

[6] The Executive Director's responsibilities appear to be numerous and varied. On information and belief, he is responsible for preparing requests for proposals from the insurance companies who serve as the SHBP's third-party administrators, and evaluating them and recommending them to the Board for approval--including the United and Anthem plans at issue in this case. He recommends amendments to SHBP regulations to the Board, and ensures approved regulations are distributed and published. He develops enrollment materials, legal notices, and plan documents for coverage options, including summary plan descriptions. He can require third-party administrators to incorporate specific plan benefit provisions into their utilization management and claim administration practices, to seek pre-authorization for new medical services, to collect information from providers and members to conduct utilization management and claim administration. Within the guidelines set down by the Board, he may determine whether a specific medical service is eligible for coverage under the SHBP and may consult with or employ medical professionals for this task, and develop coverage policies based on those determinations.

participate in the SHBP, including by: determining which of their employees meet eligibility requirements; providing enrollment materials, legal notices and plan documents; providing enrollment instruction and assistance; providing enrollment forms; and deducting premiums from employees' paychecks. The Employing Entities also provide assistance and information to employees regarding enrolling in the SHBP through their human resources officers.

127.   Defendants Department of Audits and Accounts, Department of Health Services, and Bibb County School District have not offered their employees any health benefit plans other than the SHPB.

### 2.    The Exclusion's Design

128.   SHBP plans are intended to cover most of members' healthcare needs (once coinsurance is paid). The United plan's stated purpose in relevant part is "to pay costs of most medically necessary care and treatment of illness and accidental Injury for Covered Persons." The Anthem plans similarly state that their purpose in relevant part is "to pay most of the costs of Medically Necessary medical care, treatment of illness, and accidental injury for Covered Services."

129.   Thus, the plans' coverage applies generally to medically necessary medical and surgical care. The United plan covers prescription drugs, outpatient surgery, physician services, and hospital facility charges that are "[p]rovided for the purpose

of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance related and addictive disorders, condition, disease, or its symptoms," deemed medically necessary, and not identified as excluded services. The Anthem plans cover "surgical services on an Inpatient or outpatient basis" and a "comprehensive selection of prescription medications."

130. Further, both plans maintain guidelines to assist them in determining if a given health service is medically necessary. Under these guidelines, both hormone therapy and masculinizing chest surgery are considered medically necessary treatments for gender dysphoria for patients; and the Anthem plans specifically list testosterone as a covered medication. These guidelines are broadly consistent with the WPATH SOC.

131. Under their guidelines, and consistent with their scope of coverage and stated purpose, these plans would cover transgender care—but for the SHBP's Exclusion.

132. Nevertheless, due to the Exclusion, both plans deny coverage for transgender care.

133. Specifically, under an exclusion section labeled "Personal Care, Comfort or Convenience," along with televisions, air conditioners, and barber service, among other things, the SHBP's United plan excludes the following services: "sex transformation operations and related services."

134.  Similarly, Anthem's SHBP plans categorically exclude "[s]ervices and supplies for a sex change and/or the reversal of a sex change." According to the Plan Summary, "[e]xcluded items will not be covered even if the service, supply, or equipment is Medically Necessary."[7]

135.  In other words, the Anthem and United plans offered by SHBP cover breast surgery and testosterone as treatment for various other conditions when medically necessary, but then withdraw that coverage from transgender plan members when they need it for medically-necessary transgender care.

## G.  *Plaintiffs' Attempts to Obtain Healthcare Coverage and Their Requests for Defendants to Stop Discriminating*

136.  At all times during their enrollment in SHBP-offered health plans, Mr. Rich, Ms. Doe, and Mr. Johnson have paid monthly, pre-tax premiums, which have been deducted from their paychecks. The amounts they paid were the same as their colleagues on the same plans.

137.  Plaintiffs Mr. Rich, Mr. Doe, and Mr. Johnson have each met the clinical criteria outlined in the WPATH Standards of Care and United and Anthem's

---

[7] Further, the health plans contain a generic exclusion for non-medically necessary services—that is, services that are not undertaken to treat a diagnosed condition. Thus, the services Mr. Rich, Mr. Doe, and Mr. Johnson seek—if undertaken for non-therapeutic reasons by persons not diagnosed with gender dysphoria—would never be covered.

guidelines, respectively, to qualify for surgical and medical treatment for gender dysphoria. Their respective surgeons have submitted the necessary documentation as part of these Plaintiffs' respective preauthorization requests.

138.   The therapists and physicians treating Plaintiffs Mr. Rich, Mr. Doe, and Mr. Johnson have determined that surgery is medically necessary to treat their respective gender dysphoria. Mr. Rich's and Mr. Doe's physicians have also determined prescription testosterone is medically necessary to treat their respective gender dysphoria.

139.   Mr. Rich, Mr. Doe, and Mr. Johnson all sought to obtain coverage from their SHBP health plans for this care, and were denied due to the Exclusion.

140.   In each case, the care would have been covered but for the Exclusion.

141.   In each case, the care would have been covered if they were not transgender—Mr. Doe and Mr. Rich even received letters stating this.

142.   As a result of the Exclusion, Ms. Doe and Mr. Rich were required to pay for care out-of-pocket; and Mr. Doe, Mr. Rich, and Mr. Johnson faced significant delays in being able to access care.

143.   Mr. Rich, Mr. and Ms. Doe, and Mr. Johnson all endeavored to have Defendants provide them some relief from this discrimination—either through

removing the Exclusion or covering their individual care—without the need for this litigation. Defendants denied all their requests.

### 1.    Mr. Rich

144.   In 2019, Mr. Rich's then therapist Anna Baxter, a Licensed Professional Counselor who works at a counseling center that specializes in gender and sexuality work, noted that Mr. Rich meets the criteria for persistent, well-documented gender dysphoria and for the past "eight years he has been steadfast and unwavering in his pursuit and knowledge of himself as a male." Ms. Baxter recommended surgery to treat Mr. Rich's gender dysphoria after concluding that he met the WPATH criteria for surgery. She indicated he plans to continue therapy "for the foreseeable future" and recommended a treatment plan of continuing therapy after surgery.

145.   On October 25, 2019, Mr. Rich had a surgery consultation with Sidhbh Gallagher, MD, a board-certified plastic and reconstructive surgeon. Dr. Gallagher founded the Gender Affirmation Surgery Program at Indiana University School of Medicine, where she was then an assistant professor in the Department of Surgery. She concurred with Anna Baxter in the need for surgery and applied for preauthorization with the SHBP.

146.   In a letter dated October 31, 2019, the SHBP denied preauthorization for Mr. Rich's surgery, citing the Exclusion of "sex transformation operations and related services."

147.   On November 6, 2019, Dr. Gallagher's office wrote a letter in support of Mr. Rich's appeal to the Georgia Department of Audits and Accounts Human Resources Department.

148.   On December 20, 2019, the Health Plan denied his internal appeal, again citing the Exclusion.

149.   As Defendants are responsible for the Exclusion, Mr. Rich sought to have them rescind it.

150.   On May 20, 2020, counsel for Mr. Rich sent a letter to Rachel King, General Counsel for the Department of Community Health, and Deputy Attorney General Bryan Webb informing them of his gender dysphoria and the need to remove the Exclusion so that he could access medically necessary care.

151.   Counsel for Mr. Rich also sent by overnight mail on October 29, 2020, an ante litem notice detailing his claims and requesting removal of the Exclusion to Wade Damron, the Director of Risk Management Services for Georgia's Department of Administrative Services; Ms. King; and Carol Schwinne, the Director of Administration of the Department of Audits and Accounts.

152. Neither request resulted in removal of the Exclusion.

153. Ultimately Mr. Rich had surgery on October 22, 2021. The SHBP did not cover any of the costs associated with his surgery. In all, Mr. Rich paid more than $11,200 out-of-pocket. To cover the costs, Mr. Rich fundraised, sold assets, and went into debt. A few months later, Mr. Rich was forced to file for bankruptcy.

154. Mr. Rich has been prescribed testosterone treatments by his physician since October 2018. For a while, his treatments were covered. However, this year, a few months after switching coverage from United to Anthem, Mr. Rich attempted to renew his testosterone prescription at the pharmacy, and was told that he could not do so due to an "issue" with his insurance. Subsequently, he received a letter explaining that coverage for his medication was being denied because the Anthem plan "covers this drug" for "primary or hypogonadotropic hypogonadism" (the failure of male testes or female ovaries to produce typical levels of sex hormones) and that Mr. Doe does "not meet the requirements" of the plan for receiving coverage for testosterone treatment. Since that time, Anthem has not covered his testosterone.

### 2. The Does

155. On July 1, 2020, Mr. Doe had a surgery consultation with Sheldon Lincenberg, MD, a board-certified plastic and reconstructive surgeon.

156.    In a phone call on or around July 6th, 2020, the SHBP denied preauthorization for Mr. Doe's surgery, citing the Exclusion.

157.    Ms. Doe contacted her plan's administrator, Blue Cross Blue Shield (BCBS), an Anthem predecessor, to inquire more about the denial and request an official denial letter, but the customer service representative informed her that the exclusion precluded any need for them to provide an official denial letter.

158.    Shortly thereafter, Ms. Doe obtained counsel.

159.    In August 2020, she filed her discrimination complaint with the GCEO, which subsequently transferred the charges to the EEOC. Ms. Doe also sought a reasonable accommodation that would waive the Exclusion.

160.    Mr. and Ms. Doe were determined that Mr. Doe have surgery before he began college in August 2021. When a surgery date was set for May 2021, Ms. Doe tried again to obtain pre-authorization. Though Anthem representatives informed her during telephone calls that her request for pre-authorization was denied based on the SHBP's Exclusion, Anthem refused to provide a denial letter to the Does or the physician's office. In the absence of a denial letter, there was nothing the Does could appeal to Anthem or the SHBP.

161.    Because the Exclusion prevented them from obtaining coverage through the SHBP, Ms. Doe and her family paid $8,679 for the surgery out-of-pocket, thanks to

a loan from a family member, stimulus funds received in connection with the Covid-19 pandemic, and the use of a credit card. It took the Does more than a year to pay off the balance on the credit card, and they are still repaying the loan from their family member. This has required the Does to defer maintenance on their home and required Mr. Doe to incur additional student loan debt, as funds used for his surgery otherwise would have gone toward his college tuition.

162.   Still, Ms. Doe describes this financial hardship as "well worth it" because of the difference surgery made for her son, who "became a totally new person" following his surgery. He is—for the first time in his life—"proud of his body" and "happier, more confident, and more social than ever before." The high school student who feared being mistaken for a girl and ate his lunch in the bathroom has thrived at college, living in a men's dormitory and making close friends.

163.   Mr. Doe says, "receiving top surgery was one of the best things I ever did for myself. I find myself better in all aspects of my life like physical health, mental health, my social life, and even things like hygiene. It evened the playing field and finally allowed me to live and function to way I was always supposed to be. Had I not gotten top surgery, I think I would be the same depressed, consistently misgendered, insecure guy I was before."

164.   Mr. Doe continues to require testosterone. His efforts to have the costs of those prescriptions covered by his SHBP-sponsored plan have been consistently denied. The denials have used the same language as the letters to Mr. Rich: they specify that the plan "covers this drug" for "primary or hypogonadotropic hypogonadism," and that Mr. Doe does "not meet the requirements" of the plan for receiving coverage for testosterone treatment.

### 3.   Mr. Johnson

165.   On December 10, 2020, Mr. Johnson's former therapist, Mick D. Rehrig, a Licensed Clinical Social Worker who specializes in gender and sexuality work, documented in letter form that Mr. Johnson meets the criteria for persistent, well-documented gender dysphoria. Additionally, Ms. Rehrig noted that Mr. Johnson has been receiving hormone treatment therapy for three years. Ms. Rehrig further noted no "mental illness[] or impairments" related to mental health concerns and that Mr. Johnson "appears competent to make decisions regarding his health care and is likely to be a responsible participant in any medical treatment."

166.   Ms. Rehrig recommended surgery to treat Mr. Johnson's gender dysphoria after concluding that he met the WPATH criteria for surgery.

167.   In early January 2021, Mr. Johnson met with Dr. Sheldon Lincenberg in Atlanta, Georgia, who sought preauthorization for Mr. Johnson's top surgery. On

January 13, 2021, Dr. Lincenberg received a denial letter from Mr. Johnson's healthcare provider citing the exclusion as the sole reason for denying Mr. Johnson coverage for the requested surgery.

168.   Mr. Johnson obtained counsel and filed an appeal with Anthem on July 14, 2021. Anthem denied Mr. Johnson's first-level appeal.

169.   On August 26, 2021, Mr. Johnson, through his counsel, sent a letter to the Bibb County School District Superintendent, the Office of General Counsel for the Georgia Department of Community Health, and the Georgia Deputy Attorney General requesting relief from their discrimination. The Office of General Counsel for the Georgia Department of Community Health and the Georgia Deputy Attorney General did not respond to Mr. Johnson's request.

170.   Thereafter, Mr. Johnson submitted a second-level appeal to Anthem. On September 22, 2021, Anthem denied Mr. Johnson's appeal. Anthem upheld its prior decision to deny coverage noting that the "diagnosis code F64.8 (Other Gender Identity Disorders) is an exclusion of your Point of Service plan through State Health Benefit Plan GA."

171.   During the open enrollment period in or around November 2021, Mr. Johnson was forced to remove himself from participation in the Anthem Plan or in any SHBP

because the offered Plans did not accommodate his medical needs, and yet was taking up about half his monthly earnings.

172.   Mr. Johnson obtained an insurance policy through the federally run health-insurance exchange for 2022, issued by Ambetter.

173.   Defendant Bibb County School District eventually responded to Mr. Johnson's letter, but it failed to provide any relief. According to the Bibb County School District, it was "unable to locate any health insurance coverage offered by the State of Georgia through the Georgia State Health Benefit Plan which will cover the requested surgery." It refused to provide any other health insurance coverage that would cover Mr. Johnson's medically necessary surgery. Instead, it recommended that Mr. Johnson obtain coverage through the federally run health insurance exchange.

174.   In any event, Defendant Bibb County School District's response was untimely. By the time it was sent, open enrollment for 2022 was long over, and Mr. Johnson had already been forced to terminate his insurance and commit to another health insurance option.

175.   Mr. Johnson's current insurance policy, offered by Ambetter, does not discriminate on the basis of sex in the provision of his top surgery. Notably, although it excludes coverage for "cosmetic breast reduction or augmentation," this exclusion

explicitly does not apply when the procedure is "for the *medically necessary* treatment of gender dysphoria."

176.   Mr. Johnson received top surgery on September 21, 2022.

**H.   Defendants' Knowledge of the Exclusion's Unlawfulness and Lack of Medical or Any Other Basis**

177.   Transgender care has long been recognized as medically necessary by courts and insurance companies, as the SHBP's own general counsel made clear to the SHBP in 2020.

178.   Yet the Defendants have knowingly and intentionally maintained the Exclusion year after year, long after it became plain—and the SHBP itself concluded—that doing so is unlawful discrimination.

179.   In its EEOC position statement in response to Mr. Rich's charge, the Department of Community Health admitted that the SHBP "established a comprehensive section of exclusionary services, supplies and treatments October 1, 1986 that is reviewed and updated every year. Intersex surgery (transsexual operations) and non-medically necessary cosmetic procedures, as defined in Section 11 of the SHBP UnitedHealthcare Plan Description are two services that have been excluded from coverage under the State Health Benefit Plan beginning October 1, 1986." The Department of Community Health provided the same explanation in its position statement in response to the Does' charges.

180.   In June 2016, following the issuance of the Nondiscrimination in Health Programs and Activities Rule under Section 1557 of the Affordable Care Act, Department of Community Health began to investigate the lawfulness of the United Exclusion.

181.   In response to an inquiry from the Department of Community Health, United provided the Department with a document titled, "Nondiscrimination 1557 FAQ - Transgender Benefits and Coverage," which stated, "Categorical coverage exclusions or limitations for all health care services related to gender transition are considered to be discriminatory." It stated that United was removing exclusions in its insured plans, and noted for self-funded plans, it offered sample benefit language to reflect the change, and that "[i]t is up to the plan sponsor to consult with their legal counsel … to review their plan as well as other relevant laws, such as Title VII of the Civil Rights Act, for any changes that may be necessary."

182.   In August 2016, United provided to the Department of Community Health a document titled, "Nondiscrimination Section 1557 Transgender Benefits," which reiterated the material in the FAQ document and noted that removing a transgender exclusion would have an incremental cost of $0.10 per member per month.

183.   In October 2016, the Department of Community Health requested guidance by Anthem's corporate predecessor Blue Cross Blue Shield of Georgia, which

provided a document, "Nondiscrimination in Health Programs and Activities Rule (ACA Section 1557) – Gender identity, notifications and language assistance." Like United, it stated that they were removing transgender exclusions from its insured products and template self-funded plans. It stated that requests for self-funded plans it administers that currently have transgender exclusions "will be responded to with an exception for administering that exclusion."

184.   In November 2016, SHBP's then-Executive Director Jeff Rickman informed the then-Commissioner of the Department of Community Health that the plans he believed were subject to Section 1557—Medicare Advantage plans and the Kaiser Permanente insurance plans—complied with that provision, which SHBP correctly understood at the time to "prohibit[] any plan that receives federal funding from discriminating in the administration of transgender benefits." SHBP also decided that its self-funded plans were not subject to Section 1557 because they did not receive federal funding and thus, in its opinion, did not have to comply with the substantive requirements of federal civil rights laws on sex discrimination, such as Title VII.[8]

---

[8] The successful functioning of SHBP's Medicare Advantage and Kaiser plans without a transgender health exclusion also underscores the arbitrariness of keeping an exclusion in other plans. It is also important to emphasize that the SHBP's decision not to maintain an exclusion consistently is no defense against

185.   In November 2017, SHBP staff revisited the issue, asking United what services were provided in its SHBP plans for "gender changes or gender dysphoria." United responded that in its "standard approach" the claims would be covered, but that under the SHBP, the claims would be denied.

186.   In October 2018, SHBP and other Department of Community Health staff once again looked at the transgender coverage issue, this time involving in the Office of Attorney General, which was by then defending the Board of Regents of the University System of Georgia in the *Musgrove* litigation challenging the transgender exclusion in its health plan.

187.   In October 2019, SHBP and senior Department of Community Health staff became aware of the settlement in the *Musgrove* case.

188.   In June 2020, Department of Community Health received an inquiry from an employer providing SHBP benefits to its employees, inquiring about how the Supreme Court ruling in *Bostock* would affect transgender benefits in the SHBP plans offered by Anthem and United. SHBP Executive Director Jeffrey Rickman

---

keeping the discriminatory Exclusion challenged here. That a state discriminates inconsistently does not make its discrimination legal when it occurs. Moreover, the SHBP's health plans are all materially different: The Kaiser plan in particular is significantly limited—for example, it only serves 27 of the state's 159 counties— while Medicare Advantage plans are only available to those enrolled in Medicare.

noted internally that "[b]efore these benefits are changed I will have to coordinate with leadership."

189.   In July 2020, Kari Gibbs, Department of Community Health Office of General Counsel, SHBP Division concluded: "Title VII require [sic] employers not to discriminate in pay or benefits on the basis of sex. The Court concluded that the term sex in Title VII would extend to gender identity in *Bostock*. Therefore, it may be inferred that the Court would find that health coverage that excludes benefits for transgender or homosexual members violates Title VII. Additionally, transgender-related care is recognized as medically necessary by insurance companies."

190.   Earlier this year, the Department of Community Health agreed to remove the transgender health exclusion from the State's Medicaid program, after they were sued about that in the *Thomas* litigation.

191.   Despite receiving information beginning in 2016 from insurance companies on the medical necessity of the care, the discriminatory nature of the Exclusion, and the low cost of removing the Exclusion, as well as a multiple requests from counsel including information on the state of the law and the consensus among professional medical organizations that insurance should cover transgender-related medical care, the Department of Community Health, the SHBP, and the Doe Defendant(s),

constituting the "leadership" of SHBP, nonetheless elected to maintain the Exclusion in the SHBP.

192.   There is no medical or cost basis for the Exclusion.[9]

193.   Defendants have never sought nor obtained any medical or scientific evidence to support their adoption and maintenance of the Exclusion.

194.   Defendants have never conducted any analysis of the cost of removing the Exclusion.

195.   The cost of removing an exclusion of medically necessary treatments for gender dysphoria from a health care plan is insignificant, as United itself made clear to the Defendants.

196.   SHBP maintains stop-loss insurance as a hedge against financial risk from claims that are unusually high.[10]

197.   Numerous Georgia public health plans, including USG's employee health plan, Georgia's Medicaid plans, and the SHBP's Kaiser and Medicare Advantage

---

[9] Cost, in any event, is not available as a defense. *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 717 (1978) ("[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII.")

[10] *See* Ga. Comp. R. & Regs. 120-2-50-.05(1). (" A multiple employer self-insured health plan is required to obtain individual and aggregate excess stop-loss coverage....")

plans, provide cost-effective healthcare coverage without containing a transgender health exclusion.

198.   Rescinding the Exclusion would not impair or threaten the Health Plans' solvency.

### H.    *Defendants' Attempt to Evade Responsibility*

199.   Before the EEOC, the Department of Audits and Accounts contended that the charge filed against it by Mr. Rich should be dropped "[d]ue to the fact that the Department of Audits and Accounts does not have any involvement or authority in determining the types of health insurance plans that are available or the services covered by the health insurance plans."

200.   Likewise, the Department of Health Services denied that it had any involvement in the offering or administration of the SHBP.

201.   Neither of these "Employing Entities" mentioned the numerous duties they undertake to ensure that the SHBP is offered to their employees and facilitate their enrollment and participation.

202.   Meanwhile, the Department of Community Health defended itself before the EEOC by arguing that it did not employ Mr. Rich, Ms. Doe, or Mr. Johnson.

203.   This finger-pointing is an attempt to evade responsibility for discrimination.

204.   Neither the text nor the purpose of the Civil Rights Act, nor the Education Amendments, nor the Constitution allows a state agency to offer its employees discriminatory benefits merely because the state has established a separate agency to administer those benefits. *See City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 718 n.33 (1978) (an employer cannot "avoid his responsibilities by delegating discriminatory programs to corporate shells.")

## I.   *Plaintiffs' Injuries*

205.   Most transgender people seek some transition-related health care in their lifetimes, commonly including a life-long course of hormone replacement therapy. Only transgender people seek transition-related medical care. Thus, the Exclusion affects only transgender people and, by definition, it affects only those people who seek a gender transition.

206.   The Exclusion not only harms the health and finances of transgender people seeking gender dysphoria treatment, it also reinforces the stigma attached to being transgender, suffering from gender dysphoria, and seeking a gender transition. The Exclusion communicates to transgender persons and to the public that their state government deems them unworthy equal treatment and the same coverage for medically necessary health care that all other employees receive in exchange for their work.

207.   Lacking any justified or justifiable reason, the only conceivable purpose of the Exclusion is to single out transgender people undergoing a gender transition for inferior compensation as compared to their colleagues, and to avoid covering a stigmatized form of health care.

208.   As a result of the Exclusion, Mr. Rich, Mr. Doe, and Mr. Johnson were forced to delay medically necessary care, leaving them to suffer from inadequately-treated gender dysphoria.

209.   Ms. Doe and Mr. Rich have been forced to pay out of pocket for medically necessary care that would have been covered, but for the Exclusion.

210.   Mr. Doe and Mr. Rich continue to be denied coverage for necessary hormone medication. Ms. Doe pays for Mr. Doe's care out of pocket; Mr. Rich currently is unable to do so.

211.   The discrimination Plaintiffs have suffered as a result of the Exclusion has caused them ill health, financial hardship, distress, anguish, stress, and humiliation.

212.   The discrimination against Plaintiffs continues as long as the Exclusion remains.

### **CAUSES OF ACTION**

### **COUNT I: 42 U.S.C. § 1983**

**Against Board Members Norm Boyd, Russ Childers, David Crews, Russell Crutchfield, Kenneth Davis, Roger Folsom, Mark Trail, Anthony Williamson,**

**and SHBP Executive Director Jeff Rickman, all in their official capacities, on behalf of all Plaintiffs**

**Against Doe Defendants, in their individual and official capacities, on behalf of all Plaintiffs**

**Against Bibb County School District and Superintendent Dr. Dan A. Sims, in his official capacity, on behalf of Plaintiff Mr. Johnson**

**Against State Auditor Greg S. Griffin, in his official capacity, on behalf of Plaintiff Mr. Rich**

**Against Commissioner of Human Services Candice L. Broce, in her official capacity, on behalf of Plaintiffs Ms. Doe and Mr. Doe**

213.   Federal law, 42 U.S.C. § 1983, creates a private right of action in favor of any person whose constitutional rights have been violated by a person acting under color of state law.

214.   The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

215.   In adopting and maintaining the Exclusion, and offering SHBP plans with the Exclusion in them to their employees, Defendants to this Count were acting on behalf of and with the authority of the State of Georgia.

216.   The above Defendants' adoption and maintenance of the Exclusion, and offering SHBP plans with the Exclusion in them to their employees, has denied and

continues to deny Plaintiffs equal protection of the laws, by discriminating against them on the basis of sex.

217.   The above Defendants' adoption and maintenance of the Exclusion is also discrimination against the suspect or quasi-suspect class of transgender people, in violation of the Equal Protection Clause.

## COUNT II: Title VII

**Against Defendants the State of Georgia, the Department of Community Health, the SHBP, and the Board of Community Health by Mr. Johnson, Ms. Doe, and Mr. Rich**

**Against Defendant Bibb County School District, by Mr. Johnson**

**Against Defendant Department of Human Services, by Ms. Doe**

**Against Defendant Department of Audits and Accounts by Mr. Rich**

218.   Title VII of the Civil Rights Act of 1964 prohibits an employer or agent thereof from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

219.   Defendants to this count are the employers, as that term is used in Title VII of the Civil Rights Act of 1964, of Mr. Johnson, Ms. Doe, and Mr. Rich.

220.   The above Defendants' adoption and maintenance of the Exclusion, and provision of SHBP health plans containing the Exclusion to employees, violates

Title VII by intentionally providing lesser terms of compensation to employees because of sex.

## COUNT III: Title IX of the Education Amendments
## Unlawful Discrimination Against Plaintiff Mr. Johnson

221.   Title IX provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

222.   Bibb County School District's adoption and maintenance of SHBP health plans containing the Exclusion violates Title IX by intentionally providing lesser terms of compensation to employees because of sex.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Declare that the Defendants' adoption and maintenance of the Exclusion, and offering SHBP health plans containing the Exclusion to employees, violates the Equal Protection Clause of the Fourteenth Amendment to the United

57

States Constitution, Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972;

b.      Enjoin Defendants from any further enforcement or application of the Exclusion or any analogous future provision;

c.      Award Plaintiffs compensatory and consequential damages in an amount to be determined at trial;

d.      Award back pay;

e.      Award pre-judgment and post-judgment interest at the highest lawful rate;

f.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses under 42 U.S.C. §§ 1988 and 2000e-5(k) or other applicable statutes; and

g.      Award Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted this 14th day of December, 2022.

*[Signatures on following page.]*

_/s/ David Brown_
David Brown*
dbrown@transgenderlegal.org
Nikki Easterday*
neasterday@transgenderlegal.org
TRANSGENDER LEGAL DEFENSE
EDUCATION FUND, INC.
520 8th Ave.
Suite 2204
New York, New York 10018
Telephone: (646) 862-9396
Facsimile: (646) 993-1686

* _pro hac vice_ motions forthcoming

_/s/ Amanda Kay Seals_
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Megan Cambre
Georgia Bar No. 167133
cambre@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 W. Peachtree Street NW
Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

_Attorneys for Plaintiff_